**Gary BAERT, an individual, Plaintiff,**

**v.**

**EUCLID BEVERAGE, LTD., Defendant.**

**No. 95 C 7196.**

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 4, 1997.

---

Stephen G. Daday, Sitt, Klein, Daday & Aretos, Arlington Heights, IL, for Gary Baert.

William Robert Sullivan, Jr., Terrence T. Creamer, Franczek, Sullivan, Mann, Crement, Hein, Relias, P.C., Chicago, IL, for Euclid Beverage Ltd.

### MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

Gary Baert lost his job as Driver–Salesman for Euclid Beverage, Ltd. because he was diagnosed as an insulin-dependent diabetic. He was offered the lesser job of warehouseman which he rejected. He was then terminated. He has filed this lawsuit in which he claims that Euclid violated the Americans with Disabilities Act (the "ADA") by not reasonably accommodating his disability. Euclid claims that it is entitled to summary judgment because (1) the Teamster's union on Baert's behalf had agreed to binding arbitration of ADA claims, (2) Baert is not disabled, (3) Baert failed to engage in the interactive process required to bring a claim for failure to accommodate, (4) Euclid offered a reasonable accommodation which Baert refused, and (5) Baert's discharge was not a pretext for discrimination.

There are only minor disputes over the facts. The undisputed facts disclose the following. Euclid is in the business of distributing Miller Beer. The Driver–Salesmen deliver the beer in tractor-trailers which are classified by the Federal Motor Carrier Safety Regulations as commercial motor vehicles. To qualify to drive one of these vehicles the operator must possess a valid commercial vehicle operator's license. To get such a license, among other things, the operator must be physically qualified. The federal regulations disqualify an insulin dependent diabetic.

Baert was employed by Euclid from 1989 to 1993 as a Route Driver–Salesman. For several years prior to 1989 he was employed as a Driver's Helper. For convenience sake the positions will be shortened to "Driver" and "Helper." He possessed a valid commercial driver's license during this entire period. Euclid is a union shop and all employees are represented by the Teamsters. Both are positions recognized under the collective bargaining agreement between Euclid and the Teamsters' Union. Under the CBA each truck that delivers a certain minimum quantity of beer must have a Driver and a Helper. A Helper performs the same duties as a Driver but is paid less. A Helper, therefore, is a kind of apprentice driver. Under the CBA, if there is a vacancy in the position of Driver and if another Driver does not wish to transfer routes, the vacancy must be offered to the Helpers and the senior bidder among the Helpers gets the promotion.

Each Driver and Helper team is assigned a route. They ride together in the cab of the

truck and deliver beer to retail customers along the route. The Driver is responsible for driving the truck, selling and delivering the beer to the customers. The Helper assists the Driver in all aspects of the job and assumes the Driver's duties in the Driver's absence. The Plaintiff disputes that driving is an essential function of the Helper's job but admits that in practice the Driver and Helper share the driving chore on a fifty-fifty basis. In any event Euclid insists that Helpers have a commercial driver's license. However if a qualified Helper is not available. Euclid has on several occasions placed an employee with out a commercial license as a helper on a temporary basis. Euclid has never hired anyone without a commercial driver's license as a full time Helper.

Federal regulations require that licensed drivers submit to a physical examination every two years. In 1991 Baert was diagnosed as having a mild form of diabetes, which under federal regulations was not considered disqualifying. However on January 4, 1993, he was diagnosed with pancreatitis and insulin-dependent diabetes. Under federal regulations, insulin-dependent diabetes absolutely disqualifies an individual as a driver of commercial vehicles. Baert therefore lost his commercial driver's license and Euclid placed him on a medical leave of absence effective January 5, 1993 where he remained until January, 1994.

On a number of occasions he inquired whether he could be reassigned as a Helper or whether there was any other jobs available. He was told by Euclid's office manager, Kathy Elvin, that the company required Helpers to have commercial driver's licenses. There was an opening for a Warehouseman's job in April, but Baert was not offered it. He does not claim that the failure to offer him this job was a violation of the ADA. At the time he was drawing more money on disability than he would have been paid as a Warehouseman. During this time he unsuccessfully lobbied his congressman for an exemption from the federal regulation which would have allowed him to get his driver's license back.

Over the course of the year Baert and his doctors signed several reports indicating that he was totally disabled and incapable of performing his duties. In December, 1993, Baert was examined by Dr. Thomas Pitts, a doctor employed by Baert's disability insurance company, who concluded that Baert was in fact capable of performing virtually any type of activity, including driving a commercial truck vehicle if he could get a waiver from the government regulations.

Shortly thereafter Euclid contacted Baert and met with him on January 4, 1994, to discuss his future with the company. At the meeting he was offered a job as a warehouseman, a position likewise represented by the Teamsters. If he accepted the job, he would retain his company-wide seniority for fringe benefit purposes but would lose his seniority under the collective bargaining agreement. He was told that he was not offered the job earlier because Euclid did not know whether he would be able to return as a driver. He was advised that he needed to decide whether to take the job very quickly. Shortly after the meeting, Baert called Euclid and asked if he could have additional time until the "end of the week" to make his decision. He was told that he could. Baert, however, instead of responding to the job offer, filed a discrimination charge with the EEOC.

The CBA provided a grievance procedure which culminated in binding arbitration. Among the contract provisions of the CBA was one that prohibited discrimination based on sex, age, race, color, creed or national origin. The provision also stated that the "parties also agree that they will endeavor to comply with the requirements of the Americans With Disability [Sic.] Act (ADA)."

Euclid's first argument is that the court is without jurisdiction because Baert, under the CBA, had agreed to a grievance procedure that included binding arbitration. This argument is not without support. The Fourth Circuit, on almost the same facts, dismissed an ADA claim because of an agreement to arbitrate in a CBA. *Austin v. Owens–Brockway Glass Container, Inc.*, 78 F.3d 875 (4th Cir.1996, *cert. denied*, —— U.S. ——, 117 S.Ct. 432, 136 L.Ed.2d 330 (1991)). The Fourth Circuit based its ruling on the Supreme Court decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111

S.Ct. 1647, 114 L.Ed.2d 26 (1991). The *Austin* decision has been criticized both by a dissenting judge and in the subsequent decision of *Pryner v. Tractor Supply Co.*, 927 F.Supp. 1140 (S.D.Ind.1996). It has been followed in *Jessie v. Carter Health Care Center, Inc.*, 930 F.Supp. 1174 (E.D.Ky.1996). Euclid urges the court to follow the Fourth Circuit. Baert wishes us not to.

The disagreement results from the perceived current viability or lack thereof of the Supreme Court decision of *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) which held that an arbitration provision in a collective bargaining agreement does not prevent a member of the bargaining unit from pursuing statutory rights in federal court. In 1991 the Supreme Court in *Gilmer* held that an individual, who agreed to submit to binding arbitration in his individual employment contract, waived his statutory rights to sue in federal court. The question is whether *Alexander* is still good law after *Gilmer*. A majority of the Fourth Circuit panel did not think so. The Supreme Court majority, in Part IV of the *Gilmer* opinion at pages 1656–7, however, made clear that it did not intend to reverse *Alexander* outright. The majority distinguished between an individual contract negotiated by the employee (the situation in *Gilmer*) and a collective contract negotiated by a union (the situation in *Alexander*). The dissenting judge in *Austin* emphasized this point. While the reasoning supporting waiver in both *Gilmer* and *Austin* is persuasive, and would easily support reversing *Alexander*, nevertheless the Court in *Gilmer* took pains to distinguish *Alexander*. This means there is enough life left in *Alexander* to bind a federal district court. *See,* e.g., *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996) (Supreme Court precedent with "motheaten foundations" not expressly overruled must be followed by lower courts.)

■ However this does not ultimately help Baert because to recover under the ADA he must first and foremost prove that he is a "qualified individual" with a disability. The act only prohibits discrimination against a qualified individual with a disability and not any individual with a disability. The phrase "qualified individual" means "an individual with a disability, with or without reasonable accommodation [who] can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The regulations provide a two step analysis for making this determination. 29 C.F.R. Pt 1630, App. p. 342. The first step is to determine whether the individual satisfies the prerequisites of the position. This means does he "possess the appropriate educational, background, employment experience, skills, *licenses,* etc." *Id.* (emphasis added) Baert plainly does not pass this first step: the fundamental prerequisite of an Euclid Driver is to drive a truck which, under federal regulation, requires a commercial driver's license. Baert does not have one and can't get one. Thus he is not qualified. The second step, which we don't need to take, is to determine whether the individual can perform the essential functions with or without a reasonable accommodation. *Id.* Clearly, no accommodation short of obtaining a waiver from the federal government, which could not be done, could make Baert qualified. *See Daugherty v. City of El Paso*, 56 F.3d 695, 697 (5th Cir.1995). *Daugherty* is about as close as you can get to being on "all fours" with this case. In that case the plaintiff was a bus driver who also was an insulin-dependent diabetic. Federal regulations similarly prohibited Daugherty from operating a bus due to his illness. The court determined he was therefore not a qualified individual.

■ The next question: even though Baert is not a qualified individual, did Euclid nevertheless have a duty to try to accommodate him by offering him another position? The court will assume (although Euclid hotly disputes it) that Baert has a disability [1]. The plain wording of the act would seem to say no. The act states:

> No covered entity shall discriminate against a *qualified individual* with a dis-

---

1. Dr. Pitt and Baert contend that there are no activities that he cannot perform. He can now do virtually anything he could do before his diagnosis as a diabetic except that which requires a commercial driver's license. We do not need to decide this question.

ability because of the disability of such individual in regard to ... discharge.... 42 U.S.C. § 12111(a) (emphasis supplied). Thus the act seems to say that it is only illegal to discriminate against a "qualified individual with a disability." *Daugherty* does not answer the question because the court considered the City of El Paso's efforts to accommodate Daugherty and held that it did make reasonable efforts when it offered Daugherty another position at lower pay which he rejected. The court said that because of civil service laws El Paso could not have done more and Daugherty had failed to show that he was treated differently from any other employee whose job had been eliminated.

Since Euclid did offer Baert the job as warehouseman which he, like Daugherty, rejected, it was his obligation at the very least to show that able-bodied Euclid employees whose jobs were eliminated were treated more favorably, that is, that Baert in fact suffered discrimination, because of his diabetic condition. Baert has wholly failed to do so. Baert's Rule 12(N) statement of material facts asserts that other injured employees were temporarily assigned to light duty without loss of seniority. However his supporting evidence indicates that in every instance the injured worker was only temporarily disabled and was expected to return to his regular job. Under the provisions of the CBA, Euclid held Baert's Driver job open for one year in the event he was able to get a waiver or get the regulation changed or recover. It was not until December, 1993, that Euclid was furnished a medical report indicating that Baert was not totally disabled although still insulin-dependent.

■ Baert's last point which needs addressing is whether the driver's license requirement should have been waived so that he could have been reassigned as a Helper. He made no showing that there was opening as a helper. He assumes that there was one after his position as a driver opened up presumably to be filled by a Helper. This however is not proof that there was in fact an opening. However in any event Euclid made a determination that driving is an essential function of the job of Helper. Helpers are expected to perform the same duties as Drivers. In the event of the incapacity of the Driver, the Helper becomes the temporary Driver and an individual without a license to drive may by necessity become the temporary Helper. The CBA provides that Helpers have first crack at an Driver openings. In this way Euclid is assured of having a licensed individual with experience available when there is a Driver vacancy. Thus the facts support Euclid's business judgment that driving was an essential function of the job of Helper. Courts ought to give substantial deference to an employer's business judgment, especially where it has been in effect for a long period of time and has been accepted by the union.

The regulations also support Euclid. *See* 29 C.F.R. Pt 1630, App. p. 342–3. The focus of the inquiry centers on whether the employer actually requires the employee to perform the specific function deemed essential. Three factors are considered. *Id.* The first factor is whether the position exists to perform the function. The second factor is to determine the number of employees available to perform the function. The third factor is the degree of expertise required to perform the function. *Id.* While the position of Helper does not totally consist of driving, it certainly exists to help perform this function. There are only two employees per truck so that the only other employee available to perform the function of driving is the Driver himself. The degree of expertise required is ample enough so that federal government has seen fit to set licensure standards which Baert cannot meet. Thus analysis under the EEOC regulations fully supports Euclid's business judgment.

This case is unfortunate. Baert had a good job that was a high paying one. Through no fault of his own he became ineligible for the job. However the ADA does not provide a safety net to require employers to create comparable jobs for employees who are no longer qualified. The motion for summary judgment is granted.

**IT IS SO ORDERED.**